IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TAMMY SEARLE, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>CONTACT LENS KING, INC.,<br><br>Defendant. | Case No.: 8:25-cv-1211 (BKS/DJS)<br><br>**DEMAND FOR JURY TRIAL** |

## COMPLAINT

Plaintiff Tammy Searle, on behalf of herself and all others similarly situated, complains of Defendant Contact Lens King, Inc. as follows, on information and belief except as to her own experiences and matters of public record:

## INTRODUCTION

1. When shopping for a good or service, consumers want to know: "how much?"[1]

2. "Unfortunately, consumers face widespread and growing unfair and deceptive fee practices that make it much harder to find out" the answer to this basic question.[2]

3. One such unfair and deceptive practice is called "drip pricing."

4. "Drip pricing" is the practice of listing one price for a good or service up front, then adding one or more hidden "junk fees" to the total price just before the consumer decides to complete the transaction.

5. Drip pricing is a form of dishonest bait-and-switch advertising.

6. For this reason, it is prohibited by New York, California, and federal consumer

[1] Trade Regulation Rule on Unfair or Deceptive Fees, 90 Fed. Reg. 2,066, 2,067 (Jan. 10, 2025).
[2] *Id.*

protection law.

7. Contact Lens King, Inc. ("Contact Lens King") sells contact lenses online. In its contact lens advertising, Contact Lens King does just what the law prohibits. The price it advertises up front is not a price any consumer can pay. The up-front price exists only to entice consumers into making a purchasing decision anchored in the advertised price, ignoring the hidden, mandatory junk fees that Contact Lens King smuggles in later.

8. Plaintiff Tammy Searle placed an order with Contact Lens King on October 29, 2024, the price of which was misleadingly and unlawfully advertised as lower than the total price she was eventually required to pay.

9. On her own behalf and on behalf of all other similarly injured consumers in New York and California, Plaintiff brings this action to put a stop to Contact Lens King's illegal business practices, challenging these practices and seeking relief for: violations of (I) the N.Y. General Business Law §§ 349–350; violations of (II) the Consumer Legal Remedies Act (CLRA), Cal. Civ. Code §§ 1750–1784; violations of (III) the False Advertising Law (FAL), Cal. Bus. & Prof. Code §§ 17500–17606; (IV) the Unfair Competition Law (UCL), Cal. Bus. & Prof. Code §§ 17200–17210; and (V) unjust enrichment.

**JURISDICTION AND VENUE**

10. The Court has subject matter jurisdiction of this action under 28 U.S.C. § 1332 because the parties are completely diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs.

11. Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) because Defendant resides in this District, and under § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## PARTIES

12. Plaintiff Tammy Searle is a resident of Palm Desert, California.

13. Defendant Contact Lens King, Inc. is a corporation incorporated in New York with its principal place of business at 30 Lawrence Paquette Drive, Champlain, NY 12919.

## FACTUAL ALLEGATIONS

### I. Drip pricing harms consumers.

14. "Hidden fees" refer to fees charged by sellers in consumer transactions that are obscured from the consumer.[3] Hidden fees are a kind of "junk fees."[4] Such fees are "mandatory but not transparently disclosed to consumers."[5] Consumers may be "lured in with the promise of a low price, but when they get to the register, they discover that price was never really available."[6] Hidden junk fees are thus "an evolution of bait-and-switch schemes."[7]

15. The practice of disclosing hidden or junk fees "late in the buying process" is often called "drip pricing."[8] Using drip pricing, "firms advertise only part of a product's total price to lure in consumers."[9] Then, once "the consumer already has spent significant time selecting and

---

[3] *See* Fed. Trade Comm'n, *Bringing Dark Patterns to Light* 7 (Sept. 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%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%20-%20FINAL.pdf/.

[4] Fed. Trade Comm'n, *FTC Proposes Rule to Ban Junk Fees* (Oct. 11, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/10/ftc-proposes-rule-ban-junk-fees/ (discussing "hidden fees" as a "junk fee practice[]").

[5] The White House, *The Price Isn't Right: How Junk Fees Cost Consumers and Undermine Competition*, The White House (March 5, 2024), https://web.archive.org/web/20250118015252/https://www.whitehouse.gov/cea/written-materials/2024/03/05/the-price-isnt-right-how-junk-fees-cost-consumers-and-undermine-competition/.

[6] *Id.*

[7] *Id*. n.2.

[8] *Bringing Dark Patterns to Light*, *supra* note 3, at 8–9.

[9] *Id.* at 8.

finalizing a product or service plan to purchase," the mandatory junk fees are disclosed.[10]

16. As an example of drip pricing of junk fees, the FTC has pointed to "'convenience fee[s]' that appear[] only when a shopper reaches the check-out screen":[11]




17. Consumers "feel committed to a purchase" at this stage of the transaction and thus go through with it anyway, despite feeling "frustrated" that "they have no idea how much it costs until it's too late."[12] "Even when consumers who have experienced drip pricing are aware of the total price and are given the option to change their selection, many do not, despite being dissatisfied."[13]

18. "[S]everal psychological mechanisms" are responsible for drip pricing's effectiveness at influencing consumer behavior. Once a consumer has committed to a purchase,

---

[10] *Id.* at 9.

[11] *Id.* at 23, 30.

[12] *Id.* at 9.

[13] U.K. Competition & Mkts. Auth., *Online Choice Architecture—How Digital Design Can Harm Competition and Consumers* 29 (Apr. 2022), https://assets.publishing.service.gov.uk/media/624c27c68fa8f527710aaf58/Online_choice_architecture_discussion_paper.pdf/.

"abandoning it" in the face of drip-priced junk fees "may cause feelings of uncertainty, dissatisfaction and cognitive dissonance." Drip pricing practitioners may "rely on the extra effort that would be required" for consumers to back out of the transaction at its last step, "such that consumers accept the price increasing later in the purchase process."[14]

19. In turn, "[s]everal behavioural biases" drive these mechanisms, including "anchoring," or the tendency to "anchor on initial price information" without "fully adjust[ing]" one's "view of the price" once all mandatory fees are disclosed; the "sunk cost fallacy," or the tendency to "continue with a process if [consumers] have invested time or effort"; and the "endowment effect," or the tendency to "place a higher value on objects [consumers] own, or have imagined owning."[15]

20. Drip pricing harms consumers.

21. "Junk fees cost American families tens of billions of dollars each year and inhibit competition, hurting consumers, workers, small businesses, and entrepreneurs."[16]

22. "Drip pricing has been shown in several experimental, theoretical and real-world contexts to lead consumers to buy more, overspend, underestimate the total price, make mistakes when searching, and be less happy with their purchases."[17]

23. As one individual commenter put it to the FTC, drip pricing is "endless, ubiquitous

---

[14] *Id.* at 30.

[15] *Id.*

[16] The White House, *Biden-Harris Administration Announces Broad New Actions to Protect Consumers From Billions in Junk Fees* (Oct. 11, 2023), https://web.archive.org/web/20250118020934/https://www.whitehouse.gov/briefing-room/statements-releases/2023/10/11/biden-harris-administration-announces-broad-new-actions-to-protect-consumers-from-billions-in-junk-fees/.

[17] *Online Choice Architecture*, *supra* note 13, at 30.

and makes it extremely difficult for consumers to make informed decisions."[18]

24. As another individual commenter put it to the FTC, "It's one thing to be on guard when walking down a dark alley, but being on guard every time you want to take a vacation, go to a concert, fly home to see a sick loved one—that's just not fair."[19]

25. "Drip pricing interferes with consumers' ability to price-compare and manipulates them into paying fees that are either hidden entirely or not presented until late in the transaction."[20]

26. According to one study, consumers who were not shown full prices, including mandatory fees, at the beginning of a transaction "ended up spending about 20% more money and were 14% more likely to complete [it]" than consumers to whom junk fees were disclosed up front.[21]

27. Another study found that consumers "based their purchase decision exclusively on the base price," that is, the price before hidden fees were added.[22]

28. Drip pricing thus causes consumers to "spend more than they intend, choose unsuitable products and waste their time."[23]

29. Drip pricing harms honest businesses too.

30. An "honest business that sets forth the total price of its product at the outset will be at a significant disadvantage when compared to a seller that advertises an artificially low price to

---

[18] Trade Regulation Rule on Unfair or Deceptive Fees, 90 Fed. Reg. 2,066, 2,067 (Jan. 10, 2025).
[19] *Id.*
[20] *Bringing Dark Patterns to Light*, *supra* note 3, at 9.
[21] *Id*.
[22] Alexander Rasch, Miriam Thöne, Tobias Wenzel, *Drip Pricing and Its Regulation: Experimental Evidence*, 176 J. Econ. Behavior & Org. 353 (2020), https://www.sciencedirect.com/science/article/abs/pii/S0167268120301189/, *pre-print available at* https://www.econstor.eu/bitstream/10419/181760/1/1029741549.pdf/.
[23] *Online Choice Architecture*, *supra* note 13, at 30.

draw consumers in, then adds mandatory charges late in the transaction."[24]

31. Drip pricing thereby harms free and fair competition.

32. "Since consumers are more likely to choose products based on characteristics they find most salient, businesses will tend to compete harder on those characteristics and less hard on less salient characteristics." Mandatory fees disclosed only at the final stages of a transaction are definitionally "less salient" than up-front prices, and therefore generate "little to no competition."[25]

33. One experimental study found that sellers "set the highest possible drip price, and compete only on base prices."[26]

34. For this reason, drip pricing is difficult or impossible to correct using only market pressures.[27]

35. The law must intervene.[28]

**II. State and federal consumer protection laws protect consumers against drip pricing.**

36. New York law prohibits "[d]eceptive acts or practices in the conduct of any business,"[29] including "[f]alse advertising."[30]

37. For more than 65 years, New York has held bait-and-switch schemes like drip pricing to be "deceptive and harmful to the public interest."[31]

38. More recently, the sponsor of a bill regulating event ticket sales, which, among

---

[24] *Bringing Dark Patterns to Light*, *supra* note 3, at 9.

[25] *Online Choice Architecture*, *supra* note 13, at 30.

[26] *Drip Pricing and Its Regulation*, *supra* note 22.

[27] *See id.* at 31 ("Where there are enough consumers who do not detect and avoid drip pricing, competitive pressures may also not be sufficient to incentivise businesses to educate or provide more upfront price information to consumers.").

[28] *See id.* (discussing regulatory interventions).

[29] N.Y. Gen. Bus. Law § 349(a).

[30] *Id.* § 350.

[31] *Electrolux Corp. v. Val-Worth, Inc.*, 161 N.E.2d 197, 204 (N.Y. 1959).

other things, prohibited drip pricing, noted the bill incorporated recommendations generated by a legislative investigation into the ticketing industry "due to concerns about potentially unfair, deceptive, and anti-consumer practices."[32]

39. California law likewise prohibits drip advertising.

40. "[T]he price a Californian sees should be the price they pay."[33] This straightforward, commonsense proposition underlies California Senate Bill 478, effective July 1, 2024, codified at Cal. Civ. Code § 1770(a)(29), called the "Honest Pricing Law" or "Hidden Fees Statute."

41. The Honest Pricing Law was enacted to suppress the dishonest bait-and-switch of drip pricing. The Legislature declared that SB 478 is "intended to specifically prohibit drip pricing, which involves advertising a price that is less than the actual price that a consumer will have to pay for a good or service,"[34] and identified drip pricing as a form of "bait and switch advertising."[35]

42. As the California Attorney General has summarized succinctly, "The law requires honest pricing. It prohibits businesses from '[a]dvertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges' other than government-imposed taxes or fees or reasonable shipping costs."[36]

43. "Honest pricing" means not just that junk fees are disclosed at some point in the

---

[32] S.B. 9461-244, Sponsors Mem. (N.Y. 2022). The enacted bill amended several sections of the New York Arts and Cultural Affairs Law. *See* 2022 N.Y. Sess. Laws ch. 358 (McKinney). The drip pricing provision is codified at N.Y. Arts & Cult. Aff. § 25.07(4).

[33] Cal. Dep't of Justice Off. of the Att'y Gen., *SB 478 Frequently Asked Questions* 1 (emphasis omitted), https://oag.ca.gov/system/files/attachments/press-docs/SB%20478%20FAQ%20%28B%29.pdf/ (last accessed Mar. 31, 2025).

[34] S.B. 478, 2023–2024 Leg. § 1(a) (Cal. 2023).

[35] *Id.* § 1(b).

[36] Cal. Dep't of Justice Off. of the Att'y Gen., *supra* note 33, at 1 (quoting Cal. Civ. Code § 1770(a)(29)(A)).

transaction. "Can a business comply with this law by disclosing additional required fees before a consumer finalizes a transaction? No. The advertised or listed price must be the full price that the consumer is required to pay. … If a business chooses to list a price for a good or service, the advertised price must be the entire amount the consumer will have to pay, not including any fees for optional services or features, taxes, or shipping charges."[37]

44. Further, "like other forms of bait and switch advertising," drip pricing is "prohibited by existing [California] statutes, including the Unfair Competition Law (Chapter 5 (commencing with Section 17200) of Part 2 of Division 7 of the Business and Professions Code) and the False Advertising Law (Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code)."[38]

45. Federal law likewise prohibits dishonest bait-and-switch advertising like drip pricing. Section 5(a) of the FTC Act prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."[39]

46. The FTC has brought enforcement actions against drip pricing practices for violating Section 5(a). For example, in *Federal Trade Commission v. Liberty Chevrolet, Inc.*, the agency alleged among other things that a car dealership advertised "vehicles for sale at a specific price but then fail[ed] to honor those prices."[40] The dealership falsely represented that consumers could purchase cars for advertised prices that "failed to include an additional certification fee."[41] Consumers would invariably find that the advertised car could "only be purchased for a higher

[37] *Id*. at 2–3.

[38] S.B. 478, 2023–2024 Leg. § 1(b) (Cal. 2023).

[39] 15 U.S.C. § 45(a).

[40] Compl. ¶ 10, *Fed. Trade Comm'n v. Liberty Chevrolet, Inc.*, No. 1:20-cv-03945-PAE (S.D.N.Y.), ECF No. 7.

[41] *Id.* ¶ 11.

price" that included the fee.[42] The dealership thereby "charge[d] consumers higher sales prices than advertised"[43] in violation of Section 5(a).[44]

47. The FTC has also warned businesses that drip pricing invites Section 5(a) enforcement. For example, the agency has warned hotel operators that failure to disclose mandatory fees up front "may violate the law by misrepresenting the price consumers can expect to pay for their hotel rooms."[45]

48. In furtherance of its authority "to define with specificity unfair or deceptive acts or practices" under the FTC Act, the FTC has recently promulgated a Rule on Unfair or Deceptive Fees, which prohibiting drip pricing in the live-event ticketing and short-term lodging industries specifically.[46]

**III. Plaintiff is a victim of Contact Lens King's deceptive drip pricing practices through its website.**

49. Contact Lens King markets and sells prescription contact lenses, reading glasses, and related eyewear products through its website.

50. Contact Lens King has used drip pricing in its sales of eyewear products on its website.

---

[42] *Id.*

[43] *Id.*

[44] *Id.* ¶¶ 35–37. The case settled for $1,500,000 in consumer refunds and permanent injunctive relief. *See Fed. Trade Comm'n v. Liberty Chevrolet, Inc.*, No. 1:20-cv-03945-PAE (S.D.N.Y.), ECF Nos. 15–16.

[45] Fed. Trade Comm'n, *Model Warning Letter* 1 (Nov. 2012), https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-warns-hotel-operators-price-quotes-exclude-resort-fees-other-mandatory-surcharges-may-be/121128hoteloperatorsletter.pdf/; *see* Fed. Trade Comm'n, *FTC Warns Hotel Operators that Price Quotes that Exclude 'Resort Fees' and Other Mandatory Surcharges May Be Deceptive* (Nov. 28, 2012), https://www.ftc.gov/news-events/news/press-releases/2012/11/ftc-warns-hotel-operators-price-quotes-exclude-resort-fees-other-mandatory-surcharges-may-be/.

[46] Trade Regulation Rule on Unfair or Deceptive Fees, 90 Fed. Reg. 2,066 (Jan. 10, 2025).

51. Plaintiff Tammy Searle has been a victim of Contact Lens King's deceptive drip pricing practices.

52. On October 29, 2024, Ms. Searle placed an order for a 1-Day Acuvue Moist 90 pack, priced at $19.95 per eye, for a subtotal of $39.90.

53. To purchase the 1-Day Acuvue Moist 90 pack, Ms. Searle added it to the Contact Lens King website Shopping Cart. She uploaded her prescription into the portal, as required, and proceeded to purchase the product. Shipping was $12.95.

54. Based on Contact Lens King's advertising about the price, baiting her to take several steps in order to make the purchase, Ms. Searle expected to pay $39.90 plus shipping.

55. That price was never available to her.

56. Contact Lens King required Ms. Searle to pay $42.16 in "Processing Fees" over and above the price it advertised to her.

57. Contact Lens King did not specify what "processing" services were covered by the $42.16 fees. In fact, it provided no information on the "Processing Fees," except the previously undisclosed price.

58. Her order total was $95.01, broken down to $19.95 for one eye, $19.95 for the lens for the other eye, $12.95 in shipping charges, and $42.16 in "Processing Fees."

59. Ms. Searle believed the initially listed price ($39.90) would be the actual price she would pay. In other words, she believed the up-front price included all mandatory fees (excluding taxes and shipping charges).

60. Ms. Searle relied on the up-front price in comparing the service offered by Contact Lens King to other available services, and in her initial purchasing decisions.

**CLASS ALLEGATIONS**

61. Plaintiff brings this action under Federal Rule of Civil Procedure 23, on behalf of

herself and all others similarly situated.

62. Subject to future amendment or revision, Plaintiff seeks to represent the following putative class ("Nationwide Class"):

> All United States residents who, within the applicable statutory of limitations, were charged "Processing Fees" by Defendant.

63. Subject to future amendment or revision, Plaintiff also seeks to represent the following putative subclass ("California Subclass") of the Nationwide Class:

> All California residents who, within the applicable statutory of limitations, were charged "Processing Fees" by Defendant.

64. Excluded from the Nationwide Class and California Subclass (together, the "Classes") are Defendant's officers, directors, and employees; Defendant's parents, subsidiaries, affiliates, and any entity in which Defendant has a controlling interest; undersigned counsel for Plaintiff; and all judges and court staff to whom this action may be assigned, as well as their immediate family members.

65. <u>Numerosity:</u> While Plaintiff does not know the exact size of the Classes, due to the nature of the trade and commerce involved, Plaintiff reasonably believes that Class Members are so numerous that joinder of all members is impracticable, as Plaintiff estimates the Classes number in the thousands.

66. <u>Commonality and Predominance</u>: Questions of law and fact common to the Classes exist and predominate over any questions affecting only individual Class Members. These include:

a) whether Defendant has charged hidden junk fees to Plaintiff and Class Members through drip pricing practices;

b) whether Defendant's conduct violates the N.Y. General Business Law, California's

Honest Pricing Law, the FTC Act, or other state and federal laws;

c) whether Defendant's conduct was unfair or objectively misleading;

d) whether Defendant has been unjustly enriched by Plaintiff's and Class Members' payments of hidden junk fees; and

e) whether Defendant should be enjoined from charging hidden junk fees through drip pricing.

67. The questions of law and fact common to Plaintiff and the Class predominate over any individualized questions because, among other reasons, Defendant has violated their rights under the same laws by the same conduct.

68. Typicality. Plaintiff's claims are typical of the Classes. Plaintiff and Class Members share the same legal rights, which Defendant has injured in the same way by charging illegal junk fees through drip pricing.

69. Policies Generally Applicable to the Classes: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Classes, making final injunctive relief appropriate with respect to the Classes as a whole. Defendant's practices challenged herein apply to and affect Class Members uniformly.

70. Adequacy. Plaintiff will fairly and adequately protect Class interests, as Plaintiff shares Class members' interest in avoiding illegal drip pricing; has no interest adverse to the Classes; has retained competent and experienced counsel experienced in consumer protection and class action litigation; and intends to prosecute this action vigorously.

71. Superiority. A class action is superior to other available methods for adjudicating this controversy because it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary

duplication of evidence, effort, and expense required by hundreds, or thousands, of individual actions. Class action treatment will permit adjudication of relatively modest claims by Class members, who could not individually afford to litigate their claims against Defendant.

## CLAIMS TO RELIEF

### COUNT I
### Violation of the N.Y. General Business Law §§ 349–350
### On behalf of the Nationwide Class

72. Plaintiff realleges paragraphs 1–60 above.

73. Defendant's drip pricing practices were conducted in "business, trade or commerce" through online sales conducted on its website. N.Y. GBL, §§ 349, 350.

74. Defendant's drip pricing, charged to consumers of its products through Defendant's website, is consumer-oriented.

75. Defendant's advertising of contact lens and related vision products at a false price, less than the actual price consumers are required to pay, is false advertising. § 350.

76. Defendant's drip pricing, which advertises contact lens and related vision products at one price but charges consumers a different, higher price, is materially deceptive and misleading. § 349.

77. Defendant's drip pricing was a willful or knowing violation of the General Business Law because it was the result of intentional design choices intended to bait consumers.

78. Defendant's deceptive and false advertising took place within the State of New York, based on Defendant's conduct in this State that facilitated the transaction leading to Plaintiff's and Class members' injuries.

79. Defendant's drip pricing was likely to mislead a reasonable consumer acting reasonably under the circumstances into believing that contact lens and related vision products could be purchased on Defendant's website for the deceptively lower prices Defendant advertises.

The products advertised on Defendant's website can only be purchased for a price higher than the one Defendant advertises. Defendant thus charges consumers higher prices than it advertises.

80. Plaintiff and Class Members have been injured as a result of Defendant's drip pricing through being lured into making purchases on Defendant's website by misleadingly low advertised prices; (2) being deprived of the ability to compare prices between contact lens and related vision products on Defendant's website and other websites; (3) investing time and effort into selecting and finalizing a purchase without knowing how much the purchase would cost; and (4) facing higher prices on Defendant's website than they would have absent Defendant's drip pricing, because honest sellers cannot fairly compete with Defendant's misleadingly low prices and because Defendant's deceptive drip pricing stifles competition on mandatory fees.

81. For Defendant's violation of the General Business Law, Plaintiff and Class members seek an injunction against Defendant's illegal drip pricing, as well as actual damages or statutory damages, §§ 349(h), 350-e, whichever is greater, trebled.

**COUNT II**
**Violation of the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750–1784**
**On behalf of the California Subclass**

82. Plaintiff realleges paragraphs 1–60 above.

83. Plaintiff and Class Members are "consumers" as defined by Cal. Civ. Code § 1761(d).

84. Defendant's selling of contact lens products to Plaintiff and Class Members are "transactions" under the meaning of Cal. Civ. Code § 1761(e).

85. Cal. Civ. Code § 1770(a)(29)(A) prohibits "[a]dvertising, displaying, or offering a price for a good or service that does not include all mandatory fees or charges" other than "[t]axes or fees imposed by a government on the transaction" or "[p]ostage or carriage charges that will be reasonably and actually incurred to ship the physical good to the consumer."

86. Defendant violated § 1770(a)(29)(A) by omitting its junk "Processing Fees" from the upfront prices listed on its platform.

87. Defendant's omission of the junk fees from its advertising was a knowing and/or intentional act committed for the purpose of luring Plaintiff and Class Members to purchase its services.

88. As a result of Defendant's violation, Plaintiff and Class Members have suffered damage by spending time and money they would not have spent but for Defendant's misleading drip pricing.

89. For Defendant's violation of the Consumers Legal Remedies Act, Plaintiff and Class Members seek an injunction against Defendant's illegal drip pricing.

90. After filing this Class Action Complaint, in accordance with Cal. Civ. Code § 1782(a), Plaintiff sent to Defendant by certified mail, return receipt requested, a notice of the violations alleged in this Complaint and a demand that Defendant correct and rectify its services accordingly.

91. If Defendant does not agree to make an appropriate correction within 30 days after receipt of this notice and demand, Plaintiff will amend this claim to relief to seek damages, in accordance with Cal. Civ. Code § 1782(a).

**COUNT III**
**Violation of the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500–17606**
**On behalf of the California Subclass**

92. Plaintiff realleges paragraphs 1–60 above.

93. Section 17500 of the California Business and Professions Code provides that it is unlawful to make, disseminate, or cause the dissemination of advertising "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to

be untrue or misleading."

94. Defendant violated Cal. Bus. & Prof. Code § 17500 by misleadingly advertising an upfront price that was lower than the total price—including hidden junk fees—it would ultimately charge.

95. As a result of Defendant's violation, Plaintiff and Class members have suffered injury in fact and lost money by spending time and money they would not have spent but for Defendant's misleading drip pricing.

96. For Defendant's violation of the False Advertising Law, Plaintiff seeks an injunction against Defendant's illegal drip pricing, as well as restitution.

**COUNT IV**
**Violation of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200–17210**
**On behalf of the California Subclass**

97. Plaintiff realleges paragraphs 1–60 above.

98. Section 17200 of the California Business and Professions Code prohibits unfair competition by means of "any unlawful, unfair or fraudulent business act or practice," including by violations of the False Advertising Law.

99. Defendant violated Cal. Bus. & Prof. Code § 17200 by (a) unlawfully engaging in drip pricing, in violation of the Consumers Legal Remedies Act, the False Advertising Law, and Section 5(a) of the FTC Act; (b) unfairly engaging in unethical bait and switch advertising that injures consumers and benefits no one but Defendant, and violates the legislatively declared policy of price transparency; and (c) fraudulently advertising an upfront price that was lower than the total price—including hidden junk fees—it would ultimately charge.

100. As a result of Defendant's violation, Plaintiff and Class members have suffered injury in fact and lost money by spending time and money he would not have spent but for

Defendant's misleading drip pricing.

101. For Defendant's violation of the Unfair Competition Law, Plaintiff seeks an injunction against Defendant's illegal drip pricing, as well as restitution.

**COUNT V**
**Unjust Enrichment, New York and California Common Law**
**On behalf of the Nationwide Class and California Subclass**

102. Plaintiff realleges paragraphs 1–60 above.

103. Plaintiff and Class Members conferred a monetary benefit upon Defendant in the form of mandatory hidden junk fees paid to Defendant.

104. Defendant appreciated or had knowledge of the benefits conferred upon it by Plaintiff and Class Members through payment of the hidden junk fees.

105. Defendant has unjustly retained the benefits that Plaintiff and Class Members conferred on it because Defendant procured the benefit through unlawful and misleading drip pricing, as well as through the oppressive psychological mechanisms on which drip pricing depends.

106. The benefits that Defendant derived from Plaintiff and Class Members rightly belong to them, and Defendant should be compelled to disgorge the wrongfully obtained fees it received as a result of its inequitable conduct.

**PRAYER FOR RELIEF**

107. **WHEREFORE,** Plaintiff Searle, individually, and on behalf of all others similarly situated, prays as follows:

A. for an Order certifying this action as a Class action under Fed. R. Civ. P. 23 and appointing Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

B. for an award of actual damages, compensatory damages, statutory damages, and

statutory penalties, in an amount to be determined, as allowable by law;

C. for equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to its drip pricing conduct;

D. for equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

E. for an award of treble or punitive damages, as allowable by law;

F. for an award of attorneys' fees and costs, as allowed by law;

G. for pre- and post-judgment interest on any amounts awarded; and

H. such other and further relief as this court may deem just and proper.

**JURY DEMAND**

108. Plaintiff demands a trial by jury on all issues so triable.

Dated: September 3, 2025

/s/ Lynn Toops
Lynn A. Toops
Natalie Lyons*
Ian R. Bensberg*
**COHENMALAD, LLP**
One Indiana Square
Suite 1400
Indianapolis, IN 46204
Tel.: (317) 636-6481
Fax: (317) 636-2593
ltoops@cohenmalad.com
nlyons@cohenmalad.com
ibensberg@cohenmalad.com

Gerard J. Stranch, IV*
Michael C. Tackeff*
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
gstranch@stranchlaw.com
mtackeff@stranchlaw.com

Samuel J. Strauss*
Raina C. Borrelli*
**STRAUSS BORRELLI, PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, IL 60611
Tel.: (872) 263-1100
Fax: (872) 263-1100
sam@straussborellli.com
raina@straussborrelli.com

*Attorneys for Plaintiff and the Proposed Classes*

*Application for admission *pro hac vice* forthcoming